1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7                       FOR THE DISTRICT OF ARIZONA
8
9    Benita Norris, a single woman,          )    No. 01-00001-PHX-EHC
                                             )
10              Plaintiff,                    )    **ORDER**
                                             )
11   vs.                                      )
                                             )
12                                            )
     STMicroelectronics, Inc., a corporation, )
13                                            )
                Defendant.                    )
14                                            )
                                             )
15   _____)

16       Before the Court is Defendant's Motion for Summary Judgment (Dkt. 47).   For

17   the reasons set forth in this opinion, Defendant's motion is granted in part, and denied in

18   part, and Plaintiff's request to strike the deposition testimony of Louis Defillo, Robert

19   Yerkey, and Jack Paul Smith is denied.

20   **I.    Background**

21          **A.    Plaintiff's Employment with Defendant**

22          Defendant, STMicroelectronics, Inc., manufactures semiconductors (at times

23   herein referred to as "wafers") and maintains a manufacturing facility in Phoenix,

24   Arizona (Def.'s Statement of Facts ¶ 1 ("DSOF")).  Defendant hired Plaintiff on March 4,

25   1996, to work in the "final test" area of Defendant's manufacturing facility under the

26   supervision of Louis Defillo ("Defillo") (DSOF ¶¶ 8, 9; Pl.'s Statement of Facts ¶¶ 1, 2

27   ("PSOF")).  Plaintiff was assigned to the D shift (PSOF ¶ 3).

28

On May 2, 1996, Defillo met with Plaintiff to explain that Plaintiff's job performance in the final test area had been marginal (DSOF ¶ 12). As a result of the meeting, Defillo assigned a department trainer, Christine Shaw, to work exclusively with Plaintiff one-on-one for a four-day period to achieve certain goals, after which time Plaintiff's performance would be evaluated (DSOF ¶ 12). At the end of this training period, on May 5, 1996, Defillo wrote an evaluation report of Plaintiff in which he stated that, notwithstanding her comprehensive training, "[Plaintiff] continues to have a difficult time comprehending and remembering basic job functions that she has been taught," that she "displays difficulty in basic workstream functions," has "difficulty in keeping work process straight," and "gets easily confused with work she is performing." (DSOF ¶ 15). As a result, Defillo recommended that Plaintiff be transferred to the burn-in area, where the work was considered easier. (DSOF ¶ 15). Plaintiff admitted at her deposition that the evaluation of her performance was accurate. (DSOF ¶ 15).

On or about August 19, 1996, Plaintiff was transferred from final test to the burn-in area of the same department, still reporting to Defillo (DSOF ¶ 15; PSOF ¶ 5). In burn-in, Plaintiff continued to have work performance issues. (DSOF ¶¶ 16, 17). On October 20, 1996, Defillo wrote an email to his supervisor, Jerome Heck, stating that Plaintiff "has had a hard time comprehending her overall job duties. It seems like every week she need[s] to get re-oriented to what the job process is. Performing work stream functions still confuses her." (DSOF ¶ 18).

On or about February 10, 1997, Defendant hired Paul Dux ("Dux"), to work in the burn-in department. (DSOF ¶¶ 43; PSOF ¶¶ 6-7). Plaintiff worked with Dux and one other employee on the D shift. (PSOF ¶ 7).

On February 12, 1997, Defillo completed an annual performance evaluation of Plaintiff, in which he indicated that improvement was needed, and outlined as performance objectives that Plaintiff "needs to display that she can perform her assigned duties with minimal supervision" and "needs to work in [*sic*] improving overall job performance." (DSOF ¶ 19). Plaintiff discussed the annual performance evaluation with

Defillo and signed it on February 21, 1997. (DSOF ¶ 20). Plaintiff testified that she disagreed with the statements made in the performance evaluation but never expressed her disagreement to Defillo. (DSOF ¶ 21). Defendant assigned Plaintiff a designated trainer and set up individual mileposts and training goals for Plaintiff to achieve. (DSOF ¶ 22).

According to department head, Robert Yerkey ("Yerkey"), Plaintiff often claimed that Defendant had not trained her to perform certain tasks as an excuse for her unacceptable performance. (DSOF ¶ 23). To remedy the problem, Plaintiff's designated trainer began having Plaintiff initial that she had been trained on a specific task. (DSOF ¶ 23). Even after utilizing this process, Plaintiff continued asserting that she had not been trained on particular tasks in the face of performance problems. (DSOF ¶ 23).

On or about April 24, 1997, Defillo wrote a Corrective Action memorandum to Plaintiff in which she was disciplined for having six absences since January 1997. (PSOF ¶ 20). Plaintiff claims that five of the six absences were due to depression she was experiencing from dealing with Dux and Defillo. See infra sec. I.B; (PSOF ¶ 20). On or about May 9, 1997, Defillo wrote a second Corrective Action memorandum to Plaintiff, stating that the occurrences necessitating the disciplinary action included "[s]everal complaints regarding your verbal conduct and perception with fellow worker regarding personal issues." (PSOF ¶ 21). The memorandum further advised that the "[a]ctions you must take to correct your actions are: Maintain communication that is job related, keep personal issues or comments out of the work place...." (PSOF ¶ 21). Both Corrective Action memorandums concluded with a statement that Plaintiff's "continued employment depends on [her] correcting this situation. Failure to do so may result in further corrective action that could include termination...." (PSOF ¶¶ 20-21). Plaintiff signed the first Corrective Action memorandum on May 1, 1997, but refused to sign the second Corrective Action memorandum because she disagreed with its contents and believed that Dux was the fellow worker who had made the complaints. (PSOF ¶¶ 20-21).

1       On or about May 14,1997, Plaintiff was transferred to another department known

2   as "Hi-Vac." (DSOF ¶ 24; PSOF ¶ 22).  Plaintiff had no prior experience working in Hi-

3   Vac. (PSOF ¶ 23).  At the time of reassignment, Defillo presented Plaintiff with a 30 to

4   60 day training and performance evaluation program, which stated "[f]ailure to comply

5   and achieve these training and certification goals in the prescribed training and evaluation

6   period may result in further disciplinary action up to and including termination of

7   employment...." (DSOF ¶ 37; PSOF ¶ 23).  Plaintiff signed the evaluation. (DSOF ¶ 28;

8   PSOF ¶ 23).

9       On May 23, 1997, Plaintiff's trainer, Jack Smith ("Smith"), sent an e-mail to

10  Defillo noting that Plaintiff was not showing much overall improvement in performance

11  and that because she had not followed his direction with respect to a certain process,

12  Plaintiff mis-processed four wafers that had to be discarded. (DSOF ¶ 31; PSOF ¶ 24).

13  On June 4, 1997, another nine wafers broke while Plaintiff was working in the Hi-Vac

14  department. (DSOF ¶ 33).  Plaintiff claims that they broke because a machine

15  malfunctioned. (DSOF ¶ 34).  Smith tested the machine at the time the wafers broke and

16  found that it worked according to specification. (DSOF ¶ 34).  Smith documented this

17  incident in a June 4, 1997, memorandum. (DSOF ¶ 35; PSOF ¶ 25).

18      Yerkey reviewed Smith's recommendation and discussed it with him. (DSOF ¶

19  37).  Smith told Yerkey that Plaintiff's problems in Hi-Vac were not the result of a

20  machine malfunction and that Plaintiff also had problems recalling her training from one

21  day to the next. (DSOF ¶ 37).  Yerkey also spoke with Al Fraden, Smith's supervisor,

22  who told him that he did not want Plaintiff to work in Hi-Vac any longer because he

23  could not afford to lose more wafers. (DSOF ¶ 38).  After reviewing a chronology of

24  Plaintiff's performance problems since her hire, Yerkey made the decision to terminate

25  Plaintiff's employment. (DSOF ¶ 39).  On June 5, 1997, Yerkey wrote Plaintiff a letter,

26  referring to the broken wafers from the night before and indicating that, "[b]ecause of

27  your inability to meet performance standards, I am terminating your employment."

28  (DSOF ¶ 40; PSOF ¶ 26).  Plaintiff claims that she did not receive the letter, but rather,

1  learned that her employment had been terminated when Yerkey called her and asked her

2  to bring in her badge. (PSOF ¶ 26).

3       **B.    Plaintiff's Harassment Allegations**

4       Plaintiff, a black female, alleges that she was sexually and racially harassed by

5  Dux while working with him in the burn-in department. (DSOF ¶ 42; PSOF ¶¶ 8-16;

6  Compl. ¶ 8 (Dkt. 1)). The first incident occurred sometime after Dux was hired but

7  before Plaintiff's transfer to Hi-Vac. (DSOF ¶¶ 43-44; PSOF ¶ 8). Plaintiff was sitting in

8  her work area when Dux came up behind her, put his hand in her hair, and moved his

9  hand in a downward motion, thereby touching her neck. (DSOF ¶ 44; PSOF ¶ 8). Dux

10 then looked at his hand and said, "Uhhh, got grease in your hair." (DSOF ¶ 44; PSOF ¶

11 8). After that, Dux told Plaintiff that she reminded him of the basketball player Dennis

12 Rodman. (DSOF ¶ 44; PSOF ¶ 8). Plaintiff became upset by this incident and went to the

13 nurse's station in tears where she reported the incident to the Olga Rodriguez

14 ("Rodriguez"), a board-certified occupational health nurse. (PSOF ¶¶ 9-10). Rodriguez

15 claims that she contacted Defillo, made him aware of what had been reported by Plaintiff,

16 and referred Defillo to Defendant's human resources department. (PSOF ¶ 11). Plaintiff

17 also claims that she spoke with Defillo the day following Dux's conduct. (PSOF ¶ 11).

18 Defillo claims he was never made aware that Dux was harassing Plaintiff. (DSOF ¶ 48;

19 PSOF ¶ 12).

20      Sometime after April 1997, Dux told Plaintiff that she needed to "wear some

21 spandex to show [the] shape of [her] body." (DSOF ¶ 45; PSOF ¶ 14). Plaintiff was

22 upset by this comment and told her friend and co-employee, Mary Gray, about it. (PSOF

23 ¶ 15). Plaintiff claims that she reported to Defillo that Dux asked her to "wear something

24 tight." (PSOF ¶ 16).

25      Sometime in April or May 1997, but after this second incident with Dux, Plaintiff

26 found a "small sticky note" posted on a window outside her immediate work area. (DSOF

27 ¶ 46; PSOF ¶ 17). The note contained a hand-drawn image of a stick figure with curly

28 hair, big lips, and wearing a dress. (DSOF ¶ 46; PSOF ¶ 17). Plaintiff claims that she

1   took the picture straight to Defillo. (PSOF ¶ 17).  Rodriguez also claims that when

2   Plaintiff showed her the sticky note she was upset and crying.  (PSOF ¶ 18).  Plaintiff

3   does not know who created this picture or who posted it near her work area. (DSOF ¶ 46).

4          Plaintiff additionally claims that Dux would, on occasion, correct her

5   pronunciation of certain words. (DSOF ¶ 47).  Plaintiff provides no details or examples of

6   when this occurred or what was said.  (DSOF ¶ 47).

7   **II.     Plaintiff's Request to Strike Defendant's Evidence**

8          Plaintiff objects to Defendant's use of the Yerkey, Defillo, and Smith deposition

9   testimony in support of its Motion for Summary Judgment. (Dkt. 51).  Because only

10  admissible evidence offered by the moving party in support of a motion for summary

11  judgment may be considered, the Court first analyzes Plaintiff's request to strike.  See

12  Fed. R. Civ. P. 56(e); Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002).

13         Plaintiff argues that the deposition testimony of these individuals is inadmissible

14  because Defendant denied the Equal Employment Opportunity Commission's ("EEOC")

15  requests to interview these individuals during its administrative investigation.  The sole

16  legal basis for this theory of inadmissibility advanced by Plaintiff is Federal Rule of

17  Evidence 403 ("Rule 403"), which provides that "[a]lthough relevant, evidence may be

18  excluded if its probative value is substantially outweighed by the danger of unfair

19  prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

20  delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid.

21  403.  Plaintiff's argument is essentially that it would be unfair to allow Defendant to rely

22  on the testimony of these witnesses because Defendant did not allow Plaintiff or the

23  EEOC access to them during the EEOC administrative process.  Plaintiff, however,

24  admits that the EEOC never attempted to compel the appearance of these witness via its

25  subpoena power.  See 29 U.S.C. § 161.  Thus, Plaintiff has not shown that Defendant's

26  denial of access to these witness during the EEOC investigation was wrongful.

27  Regardless, the question is not whether Plaintiff had access to these witnesses during the

28  EEOC investigation, but whether Plaintiff had access to them during this current lawsuit.

1   Plaintiff does not argue that she was denied access to these witnesses in this case, and

2   thus, there is no risk of unfair prejudice to Plaintiff.

3          Accordingly, Plaintiff's request to strike the deposition testimony of Defillo,

4   Yerkey, and Smith is denied.

5   **III.    Summary Judgment Standard**

6          Summary judgment is appropriate "when there is no genuine issue of

7   material fact" such that "the moving party is entitled to judgment as a matter of law."

8   Fed. R. Civ. P. 56.  Under summary judgment practice, the moving party bears the initial

9   responsibility of presenting the basis for its motion and identifying those portions of the

10  record, together with affidavits, that it believes demonstrate the absence of a genuine

11  issue of material fact.  Celotex, 477 U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070,

12  1076 (9th Cir. 2001) (*en banc*).  In assessing whether a party has met its burden, the court

13  views the evidence in the light most favorable to the nonmoving party.  Allen v. City of

14  Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995).  All reasonable inferences are drawn in

15  favor of the nonmovant.  Gibson v. County of Washoe, 290 F.3d 1175, 1180 (9th Cir.

16  2002).  If the moving party meets its burden with a properly supported motion, the burden

17  then shifts to the opposing party to present specific facts that show there is a genuine

18  issue for trial.  Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th

19  Cir. 1995); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

20          If the moving party presents evidence that, taken by itself, would establish the

21  right to a directed verdict at trial, the motion for summary judgment must be granted in

22  the absence of any significant probative evidence tending to support the opposing party's

23  theory of the case.  First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968);

24  THI-Hawaii, Inc. v. First Commerce Fin. Corp., 627 F.2d 991, 993-94 (9th Cir. 1980).

25  Conclusory allegations, unsupported by factual material, are insufficient to defeat a

26  motion for summary judgment.  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

27  Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56,

28  designate specific facts that show there is a genuine issue for trial. Anderson, 477 U.S. at

1   249; <u>Devereaux</u>, 263 F.3d at 1076.  A factual dispute is genuine if the evidence is such

2   that a rational trier of fact could resolve the dispute in favor of the nonmoving party.

3   <u>Anderson</u>, 477 U.S. at 248.  A fact is material if determination of the issue might affect

4   the outcome of the case under the governing substantive law. <u>Anderson</u>, 477 U.S. at 248.

5   Thus, a party opposing a motion for summary judgment cannot rest upon bare allegations

6   or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue

7   for trial.  <u>Anderson</u>, 477 U.S. at 250.  If the nonmoving party's evidence is merely

8   colorable or not significantly probative, a court may grant summary judgment.  <u>See</u>

9   <u>Anderson</u>, 477 U.S. at 249; <u>see also</u> <u>Cal. Architectural Bldg. Prods., Inc. v. Franciscan</u>

10  <u>Ceramics</u>, 818 F.2d 1466, 1468 (9th Cir. 1987).

11  **IV.    Analysis**

12      **A.      Hostile Work Environment Claim**

13       Title VII of the Civil Rights Act of 1964 forbids employment discrimination

14  against "any individual" based on that individual's "race, color, religion, sex, or national

15  origin." Pub. L. 88-352, § 704, 78 Stat. 257, as amended, 42 U.S.C. § 2000e-2(a).

16  <u>Burlington Northern & Santa Fe Ry. v. White</u>, 126 S.Ct. 2405, 2408 (2006).  To establish

17  a prima facie hostile work environment claim under Title VII, Plaintiff must raise a triable

18  issue of fact as to whether (1) she was "subjected to verbal or physical conduct" because

19  of her race or sex, (2) "the conduct was unwelcome," and (3) "the conduct was

20  sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and

21  create an abusive work environment." <u>Manatt v. Bank of Am.</u>, 339 F.3d 792, 798 (9th

22  Cir. 2003).

23      Defendant concedes that there is a factual dispute about whether Defillo was made

24  aware of Dux's behavior and of the picture Plaintiff found outside of her work area.

25  (DSOF ¶ 48; PSOF ¶¶ 8-17).  Nonetheless, Defendant argues that the harassment Plaintiff

26  claims to have endured was not "severe or pervasive" enough to "alter the conditions of

27

28

1    her employment and create an abusive work environment."[1]  Brooks v. City of San

2    Mateo, 229 F.3d 917, 923 (9th  Cir. 2000).  To create a hostile work environment, the

3    conduct must be severe or pervasive enough to create an *objectively* hostile or abusive

4    work environment – i.e. an environment that a reasonable person would find hostile or

5    abusive.  Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (emphasis added).  Moreover, the

6    victim must also *subjectively* perceive the environment to be abusive or else the conduct

7    would not actually alter the conditions of the victim's employment.  Harris, 510 U.S. at

8    21 (emphasis added).  Because there is no question that Plaintiff *subjectively* perceived

9    her environment to be abusive, the Court must only consider whether the conduct at issue

10   was severe or pervasive enough to create an *objectively* hostile or abusive work

11   environment.

12         In determining objective hostility, the Supreme Court has prescribed a multi-factor

13   test: (1) the frequency of discriminatory conduct, (2) severity of the conduct, (3) whether

14   the conduct is physically threatening or humiliating, or a mere offensive utterance, and

15   (4) whether the conduct unreasonably interferes with the employee's job performance.

16   Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L. Ed. 2d 295 (1993).

17   The Ninth Circuit has held "the required showing of severity or seriousness of the

18   harassing conduct varies inversely with the pervasiveness or frequency of the conduct."

19   Brooks v. City of San Mateo, 229 F.3d 917, 926 (9th Cir. 2000) (quoting Ellison v.

20   Brady, 924 F.2d 872, 878 (9th Cir. 1991)).

21         In Brooks, relied on by Defendant in support of its motion, the Ninth Circuit

22   affirmed summary judgment for a defendant employer where the plaintiff was harassed

23

24         [1]There are four incidents of alleged verbal and/or physical conduct at issue in this
25   case: (1) when Dux came up behind Plaintiff as she sat in her work area, touched her hair and
     neck, looked at his hands and said, "Uhhh, got grease in your hair," and then told Plaintiff
26   that she reminded him of the basketball player Dennis Rodman; (2) when Dux told Plaintiff
     that she needed to wear some spandex to show the shape of her body; (3) when Plaintiff
27   found a picture of a stick figure with large lips, curly hair, and wearing a dress posted on a
28   window near her work area; and (4) when Dux corrected Plaintiff's pronunciation of words.

on a single occasion.  See 229 F.3d 917 (9th Cir. 2000).  The conduct of the plaintiff's

male coworker was notably egregious.  During one evening shift in a 911 call center, the

plaintiff's coworker placed his hands on the plaintiff's stomach and commented on its

softness and sexiness.  Also, later that same evening, the same coworker cornered the

plaintiff against a communications console while she was taking an emergency call,

forcing his hand underneath her sweater and bra to fondle her bare breast as she talked on

the phone.  When the plaintiff ended that call, the coworker told her that she didn't have

to worry about cheating on her husband because he would "do everything."  Brooks, 229

F.3d 920.  The Ninth Circuit noted that a "case involving a single incident of sexual

harassment is obviously distinct from one involving a series of incidents, which the

employer knows about and does nothing to correct."  Brooks, 229 F.3d at 924 n.4.  Under

the circumstances, the Ninth Circuit reasoned that while the plaintiff's coworker's actions

were egregious, he was not the defendant in the case.  Because the City of San Mateo was

the defendant, the plaintiff needed to show that she reasonably feared she would be

subject to such misconduct in the future because the City encouraged or tolerated the

harassment, something she could not do because the coworker was immediately removed

from his job, prosecuted, and spent time in jail after the plaintiff reported the incident.

Brooks, 229 F.3d at 924-25.

　　　　Unlike Brooks, the current case involves a series of incidents over a several month

period that never culminated with any corrective action against Dux or any other of

Plaintiff's coworkers.[2]  As the Court noted in Brooks, "[i]n such circumstances, the

non-action by the employer can fairly be characterized as acquiescence, i.e., having

changed the terms and conditions of employment to include putting up with harassment

from other employees."  Brooks, 229 F.3d at 924 (citing Hostetler v. Quality Dining, Inc.,

---

[2] While Plaintiff did testify that her transfer to the Hi-Vac department occurred the day after she reported the sticky note to Defillo, Defillo's denial that he was informed of any harassment negates any inference that Plaintiff's transfer to Hi-Vac was a corrective action to separate her from Dux and the burn-in department.

1  218 F.3d 798, 802-05 (7th Cir. 2000).  Thus, <u>Brooks</u> is distinguishable from the current

2  case in as much as it involved a single incident of harassment that was properly dealt with

3  by the employer.

4      In this case, there is a genuine dispute as to a material fact; whether Defendant's

5  immediate supervisor, Defillo, was aware of the allegedly harassing conduct.  <u>See</u>

6  <u>Anderson v. Liberty Lobby</u>, Inc., 477 U.S. 242, 247-48 (1986) (a factual dispute is

7  genuine if the evidence is such that a rational trier of fact could resolve the dispute in

8  favor of the nonmoving party).  Defendant's witness on this point, Defillo, denies that he

9  was ever made aware of the harassing conduct. (DSOF ¶ 48; PSOF ¶ 12).  On the other

10  hand, Plaintiff and Rodriguez both testified at their depositions that Defillo had been

11  alerted to the conduct in question and that he was aware of what was happening. (DSOF ¶

12  48; PSOF ¶¶ 9-17).  If Defillo was aware of the harassment Plaintiff was experiencing,

13  and took no action, a trier of fact could find that Plaintiff might have reasonably feared

14  that she would be subject to such misconduct in the future because Defendant's inaction

15  could be seen as encouragement or tolerance of the harassment.  <u>See</u> <u>Brooks</u>, 229 F.3d at

16  924-25; <u>see also</u> <u>Matsushita Elec. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (a

17  district court must view the underlying facts and the inferences to be drawn from those

18  facts in the light most favorable to the nonmoving party).

19      Moreover, applying the Supreme Court's factors, the undisputed evidence is

20  sufficient to support a finding that the harassment Plaintiff endured was severe and

21  pervasive enough to create an objectively hostile or abusive work environment.[3]  <u>See</u>

22  <u>Forklift Sys., Inc.</u>, 510 U.S. at 23 (discussing factors).  First, the harassment at issue

23  occurred over the course of only a few months, between February 1997, and May 1997.

24

25

26      [3] The Court does not have enough facts before it to analyze whether Dux's alleged
correction of Plaintiff's word pronunciation meets these factors. It is unlikely that this

27  conduct, on its own, would.  <u>See</u> <u>Forklift Sys., Inc.</u>, 510 U.S. at 23 ("mere offensive

28  utterances" unlikely to create hostile work environment).

Dux's touching of Plaintiff's hair and neck, his racially[4] and sexually[5] oriented remarks to her, and the posting of a sticky note[6] near Plaintiff's work area may not appear to be as severe as some of the conduct cited in Defendant's Ninth Circuit authorities. Nonetheless, the frequency and pervasiveness of these events within only a few months decreases the corresponding severity required for a finding that the environment was hostile.  See Brooks, 229 F.3d at 926 ("the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct."); *cf.* Manatt, 339 F.3d. at 799 (two troubling incidents occurring over a span of two-and-a-half years, and several off-color remarks, did not alter the conditions of plaintiff's employment).  In addition, Dux's touching of Plaintiff's hair and neck could be considered "physically threatening," especially because Plaintiff was working at her workspace with her back towards him when this unwelcome touching occurred. Defendant's inaction could have caused Plaintiff to reasonably believe another touching incident might occur.  See Forklift Sys., Inc., 510 U.S. at 23; Brooks, 229 F.3d at 924-25.

---

[4] Dux's statement: "Uhhh, got grease in your hair[,]" could be interpreted as a racially oriented remark.  Plaintiff described the racial implications in her deposition: "As a black woman, I use oil in my hair.  And anytime someone of another race put [*sic*] their hands in your hair and look [*sic*] at it like it's nasty, that's racial." (PSOF ¶ 13).  Dux's statement that Plaintiff reminded him of Dennis Rodman could also be interpreted as racially oriented because Dennis Rodman is black.  The parties have failed to point the Court to evidence of Dennis Rodman's identity.  Nonetheless, the Court will take judicial notice of the fact that Dennis Rodman is a black male athlete and celebrity.   See http://www.drodman.com.

[5] Dux's statement to Plaintiff that she needed to wear some spandex to show the shape of her body could be interpreted as a sexually oriented remark.  The Court will take judicial notice of the fact that spandex is a skin-tight fabric made of stretch fiber.   See http://www.elaspan.com; http://www.lycra.com.   In addition, because Dennis Rodman is a man, Dux's statement that Plaintiff reminded him of Dennis Rodman could also be interpreted as a sexually oriented comment about Plaintiff's physical appearance.

[6] Plaintiff testified that she believed that the posting of the sticky note was a form of sexual harassment because she believed that the picture depicted her, a black female, and was posted on a door where anyone could "see it and make fun of it or disagree with it or just frown on it."

1    Last, the evidence demonstrates that the conduct did actually interfere with the Plaintiff's

2    job performance by causing her to become upset, make several trips to the nurse's station

3    in tears, and to ultimately miss work because of depression. See Forklift Sys., Inc., 510

4    U.S. at 23.

5         Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's hostile

6    work environment claim is denied.

7         **B.    Retaliation**

8         A separate section of the Title VII, commonly known as the "anti-retaliation

9    provision," forbids an employer from "discriminat[ing] against" an employee or job

10   applicant because that individual "opposed any practice" made unlawful by Title VII or

11   "made a charge, testified, assisted, or participated in" a Title VII proceeding or

12   investigation. § 2000e-3(a). Burlington Northern & Santa Fe Ry. v. White, 126 S.Ct.

13   2405, 2408 (2006). To establish a claim for retaliation, Plaintiff must demonstrate: (1)

14   involvement in a protected activity; (2) an adverse employment action (or "challenged

15   action")[7]; and (3) causal link between the two. Brooks, 229 F.3d at 928. If Plaintiff

16   makes a prima facie case, the burden then shifts to Defendant "to articulate a legitimate,

17   non-discriminatory reason for the adverse employment action." Brooks, 229 F.3d at 928.

18   If the employer articulates such a reason, the burden then shifts back to plaintiff to

19   "demonstrat[e] that the reason was merely a pretext for a discriminatory motive." Brooks,

20   229 F.3d at 928. Only then does the case proceed beyond the summary judgment stage.

21   Brooks, 229 F.3d at 928.

22         **1.    Protected Activity**

23

24

25         [7]In White, the Court used the term "challenged action" instead of "adverse

26   employment action," because Title VII's anti-retaliation provision "is not limited to

     discriminatory actions that affect the terms and conditions of employment." White, 126 S.Ct.

27   at 2412-13. Title VII also protects employees from retaliation in the form of "actions not

28   directly related to [the] employment" and "harm outside the workplace." Id. at 2412.

1    Making even an informal complaint to a supervisor is a protected activity under

2    Title VII.  See Manatt, 339 F.3d at 800 n.8.  Plaintiff claims that she began making

3    complaints to Defillo in April 1997, after the first incident with Dux occurred. (PSOF ¶¶

4    8, 11).  Plaintiff also claims that she reported each subsequent incident of harassment to

5    Defillo after they occurred. (PSOF ¶¶ 16-17).  Even though the facts are disputed on this

6    point, the Court must draw every inference in favor of Plaintiff, and accept her account as

7    true.  Thus, Plaintiff has put forth sufficient evidence that she engaged in a protected

8    activity.

9                    **2.        Challenged Actions**

10    The Supreme Court recently clarified the law on which challenged actions would

11    sustain a claim for retaliation.  Adopting the standard of the Seventh and D.C. Circuits,

12    the Supreme Court held  that "a plaintiff must show that a reasonable employee would

13    have found the challenged action materially adverse." White, 126 S.Ct. at 2415.  A

14    challenged action is materially adverse if it would "have dissuaded a reasonable worker

15    from making or supporting a charge of discrimination." White, 126 S.Ct. at 2415 (internal

16    citations omitted). Whether a particular challenged action is materially adverse "will often

17    depend upon the particular circumstances." White, 126 S.Ct. at 2415.

18                    **a.        Defillo's First Corrective Action Disciplinary**

19                            **Memorandum**

20    On May 1, 1997,[8] Defillo disciplined Plaintiff for "excessive attendance

21    infractions," by providing her with a "Corrective Action First Reminder." (PSOF ¶ 20).

22    Whether this constitutes an adverse action is a difficult question because precedent exists

23    on both sides of the issue.  Some courts have held that unwarranted negative job

24    evaluations or undeserved performance ratings can be considered adverse employment

25    actions.  See e.g., Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (adverse

26

27    ─────────────────────

28    [8]The Corrective First Action Reminder is dated April 24, 1997, but was signed on
May 1, 1997, by both Plaintiff and Defillo. (PSOF ¶ 20, Ex. 6).

1   employment action when an employee received his first-ever low performance rating after

2   discussing Title VII grievances with his superior).  Still, other cases involving similar

3   facts have gone the other way.  See e.g., Kortan v. California Youth Auth., 217 F.3d

4   1104, 1113 (9th Cir. 2000) (a negative evaluation was not an adverse employment action

5   where plaintiff was neither demoted, deprived of work responsibilities, assigned more

6   difficult work, denied salary, terminated nor suspended).  In White, the Supreme Court

7   left the door open for letters of caution to qualify as challenged actions in appropriate

8   circumstances, emphasizing that "context matters."  See White, 126 S.Ct. 2415-16; see

9   also Roldan v. Chertoff, 2006 U.S. Dist. LEXIS 78574 (S.D. Cal. 2006) (discussing the

10  law of the Ninth Circuit and other districts after White).

11          Given the circumstances, and drawing all reasonable inferences in favor of

12  Plaintiff, the Court finds that the Corrective Action memorandum was the type of

13  employment action that "a reasonable employee would have found...materially adverse."

14  White, 126 S.Ct. at 2415.  The Corrective Action memorandum provided the foundation

15  for any more severe discipline Defendant chose to impose in the future.  Specifically, it

16  concluded by stating that Plaintiff's "continued employment depends on [her] correcting

17  this situation.  Failure to do so may result in further corrective action that could include

18  termination...."  (PSOF ¶ 20).  The Court is persuaded that receiving such a disciplinary

19  notice from one's immediate supervisor after making an informal complaint could

20  dissuade "a reasonable worker from making or supporting a charge of discrimination."

21  See White, 126 S.Ct. at 2415.

22                  **b.    Defillo's Second Corrective Action Disciplinary**

23                          **Memorandum**

24          On May 9, 1997, Defillo provided Plaintiff with another "Corrective Action First

25  Reminder." (PSOF ¶ 21).  This second memorandum stated that the occurrences leading

26  to this reminder were "[s]everal complaints regarding your verbal conduct and perception

27  with fellow worker regarding personal issues." (PSOF ¶ 21).  For the same reasons

28  discussed, supra, with respect to the first Corrective Action memorandum, the Court finds

that this memorandum was the type of employment action that "a reasonable employee would have found...materially adverse." <u>White</u>, 126 S.Ct. at 2415. It provided the foundation for any more severe discipline Defendant chose to impose in the future and would dissuade "a reasonable worker from making or supporting a charge of discrimination." <u>See</u> <u>White</u>, 126 S.Ct. at 2416-17 (finding that the a jury could reasonably conclude that the plaintiff's reassignment from forklift duty to standard track laborer tasks was materially adverse to a reasonable employee).

### c. Plaintiff's Transfer to Hi-Vac for a 30 to 60 Training and Evaluation Period

In <u>White</u>, the Supreme Court made clear that reassignment of duties can constitute retaliatory discrimination. <u>See</u> <u>White</u>, 126 S.Ct. at 2416-17 ("Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.") (internal quotations omitted). In this case, Plaintiff had no prior experience in Hi-Vac and was transferred to this new department with a 30 to 60 day performance plan, under which she was required to become certified or face termination. (DSOF ¶ 24; PSOF ¶¶ 22-23). Plaintiff struggled to learn the tasks required in this new position. (DSOF ¶¶ 31-36). Under these circumstances, Plaintiff's reassignment to Hi-Vac appears to be the type transfer that would "have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>White</u>, 126 S.Ct. at 2415.

Nevertheless, Plaintiff herself testified that she "didn't think [her transfer to Hi-Vac] was harassment[,]" "didn't think to much of it[,]" and that "it was okay with [her]." (Norris Dep. 109:17-23). In addition, Plaintiff testified that she was "happy being away from [Dux]" and never objected to the transfer. (Norris Dep. 110:6-10). This evidence suggests the opposite of what Plaintiff claimed before the EEOC and what she claims in her current briefs, i.e., that Plaintiff herself did not believe her transfer to Hi-Vac to be an adverse employment action. Plaintiff's only other evidence that her transfer was an

adverse action is its temporal proximity following her complaints to Defillo.  But even Plaintiff's evidence on this point suggests that Plaintiff believed the transfer might have been remedial in nature and a way for her to continue her employment free from the harassment she encountered in the burn-in department.  Plaintiff testified that she thought she was "transferred thinking it was because – transferring me from working with Paul Dux at the time." (Norris Dep. 109:17-23). Further, department head, Yerkey, testified that Plaintiff herself requested the transfer to Hi-Vac because she "thought it was...an easier place to work, that the processes were easier, [and] that she would have a better chance of success there." (Yerkey Dep. 40:19-24; 41:10-17).  No rational trier of fact could find that Plaintiff's transfer to Hi-Vac was an adverse employment action based on this evidence.  See Anderson, 477 U.S. at 249 (nonmoving party's evidence must be more than merely colorable or a court may grant summary judgment).[9]

The only other evidence in the record arguably supporting Plaintiff's position is the EEOC's determination letter, in which it concluded that after Plaintiff complained, "she was issued a warning for absenteeism, placed on a training plan and transferred to another work area on [*sic*] where the workload was heavier.  [Plaintiff] did not have the experience necessary to work in her newly assigned area." (PSOF ¶ 38).  As discussed, supra, Plaintiff's own deposition testimony subsequent to this EEOC determination does not support her claim that the transfer and/or training plan was an adverse action. Moreover, the EEOC's determination cannot help Plaintiff survive summary judgment on this issue.  See Mondero v. Salt River Project, 400 F.3d 1207, 1214-1215 (9th Cir. 2005) (affirming summary judgment and noting that an EEOC determination does not create a genuine issue of material fact).

---

[9] The same evidence also demonstrates that the corresponding 30 to 60 day training program that accompanied Plaintiff's move to Hi-Vac was not an adverse employment action.  (DSOF ¶ 27; PSOF ¶ 23).

1  Accordingly, Plaintiff has failed to make a prima facie showing that her transfer to

2  Hi-Vac for a 30 to 60 day evaluation and training period was an adverse employment

3  action.

4          **d.**      **Plaintiff's Negative Performance Evaluation in Hi-Vac**

5  On June 4, 1997, Plaintiff's trainer in Hi-Vac, Smith, wrote a memorandum in

6  which he noted that Plaintiff had shown "minimal improvement" in Hi-Vac, and

7  described the incidents that led Plaintiff to break and/or mis-process 13 wafers. (DSOF ¶

8  13; PSOF ¶ 25).  Smith recommended that Plaintiff be transferred back to her prior

9  position.  As discussed, supra, with respect to the Corrective Action memorandums,

10  negative employment evaluations may sometimes be considered adverse employment

11  actions, depending on the circumstances.  See e.g., Yartzoff v. Thomas, 809 F.2d 1371,

12  1376 (9th Cir. 1987); White, 126 S.Ct. 2415-16.

13  Because this negative work evaluation provided part of Defendant's claimed basis

14  for Plaintiff's termination, and recommended another transfer of Plaintiff's job duties, a

15  trier of fact could conclude that it was the type of action a reasonable employee would

16  have found to be materially adverse.  See White, 126 S.Ct. at 2415.

17          **e.**      **Plaintiff's Termination**

18  Defendant does not dispute that Plaintiff's termination was an adverse action, only

19  that a causal link does not exist between Plaintiff's complaints to Defillo and her

20  subsequent termination.  Thus, the Court will treat Plaintiff's termination as an adverse

21  employment action for the purposes of this motion.

22        **3.**    **Causal Link**

23  In the Ninth Circuit, a plaintiff can establish causation (or a "causal link") with

24  "circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in

25  protected activities and the proximity in time between the protected action and the

26  allegedly retaliatory employment decision." Yartzoff, 809 F.2d at 1376.  In cases such as

27  this, where the only evidence of a causal link is temporal proximity, the Ninth Circuit has

28  held that a plaintiff must show that the challenged action took place "close on the heels"

1    of the protected activity.  See Ray v. Henderson, 217 F.3d 1234, 1244 (9th Cir. 2000); see

2    also Passantino v. Johnson & Johnson Consumer Prods., 212 F.3d 493, 507 (9th Cir.

3    2000) (requiring that the challenged action take place "within a reasonable period of

4    time" after the protected activity).

5         Both of the Corrective Action disciplinary memorandums given to Plaintiff on

6    May 1, 1997, and May 9, 1997, came "close on the heels" of Plaintiffs complaints to

7    Defillo in April 1997, only one month prior.  (PSOF ¶¶ 20-21).  Furthermore, the

8    evidence suggests that Defillo issued both of these memorandums to Plaintiff. (PSOF ¶¶

9    20-21).  It is reasonable to infer from the close proximity of Plaintiff's complaints to the

10   subsequent discipline that a causal link exists between these events.  Thus, Plaintiff has

11   put forth sufficient evidence to support a finding that there was a causal link between her

12   complaints to Defillo and the subsequent Corrective Action memorandums.  The more

13   difficult causal issues involve the links, if any, between Plaintiff's complaints of

14   harassment to Defillo and her subsequent negative evaluation on June 4, 1997, and

15   termination the following day.

16        Looking first at Plaintiff's negative performance evaluation on June 4, 1997,

17   Plaintiff points to no evidence that there was a link between her prior complaints to

18   Defillo and Smith's subsequent negative evaluation of her.  To the contrary, the evidence

19   suggests that Plaintiff was being trained by Smith in the Hi-Vac area and his evaluation,

20   as Plaintiff's trainer, was a matter of course. (DSOF ¶¶ 30-36; PSOF ¶ 25).  Plaintiff does

21   not dispute the fact that she broke the wafers which led to this negative evaluation.

22   (DSOF ¶ 32).  Thus, Plaintiff has failed to make a prima facie showing the June 4, 1997,

23   evaluation was made in retaliation to her complaints of harassment.  See Mondero v. Salt

24   River Project, 400 F.3d 1207, 1213 (9th Cir. 2005) (Plaintiff failed to present any

25   evidence that Defendant's decision-makers were influenced or even aware of the alleged

26   gender bias of some of its agents).

27        With respect to Plaintiff's termination on June 5, 1997, Defendant argues that there

28   can be no causal link between it and Plaintiff's prior complaints because it was Yerkey,

and not Defillo, who was the single decision-maker responsible for terminating Plaintiff's employment.  Plaintiff does not dispute that Yerkey was the single decision-maker responsible for her termination and has not pointed to any facts in the record that would suggest that Yerkey knew about the harassing conduct. (DSOF ¶¶ 37-41; PSOF ¶ 26). Plaintiff testified at her own deposition that she did not tell Yerkey about the harassing conduct, and that she did not believe she was terminated for any reason other than her failure to meet performance standards. (DSOF ¶ 41; Norris Dep. 133:12-17).  Thus, the Court has no evidence before it that would suggest a causal link between Plaintiff's complaints to Defillo, Rodriguez, and Mary Gray in April 1997, and her termination by Yerkey on June 5, 1997.  See Mondero v. Salt River Project, 400 F.3d 1207, 1213 (9th Cir. 2005).  While an inference could be drawn that Yerkey, as Defillo's supervisor, learned of Plaintiff's complaints through Defillo or others, Plaintiff's own testimony that her termination was not due to any reason other than her failure to meet performance standards does not support this otherwise reasonable inference.

Accordingly, Plaintiff has failed to set forth a prima facie case of retaliation with respect to her June 4, 1997, negative performance evaluation and her June 5, 1997, termination.

**4.      Defendant's Legitimate Reasons for the Challenged Actions**

Having determined that Plaintiff has set forth a prima facie case for retaliation with respect to the two Corrective Action memorandums, the Court must now consider whether Defendant has presented any legitimate non-discriminatory reasons for these adverse employment actions.  See Brooks, 229 F.3d at 928 (if Plaintiff makes a prima facie case, the burden then shifts to Defendant "to articulate a legitimate, non-discriminatory reason for the adverse employment action.").

While Defendant has provided ample evidence of Plaintiff's general work performance during her employment, it does not specifically address either of the Corrective Action memorandums in its motion for summary judgment, statement of facts,

or reply.  Defendant may very well have non-discriminatory reasons, but its failure to put forth those reasons precludes the Court from granting summary judgment on these issues. Accordingly,

**IT IS ORDERED:**

1.   Defendant's Motion for Summary Judgment (Dkt. 47) is **granted** as to Plaintiff's retaliation claim involving Plaintiff's transfer to Hi-Vac for a 30 to 60 day evaluation and training program.

2.   Defendant's Motion for Summary Judgment (Dkt. 47) is **granted** as to Plaintiff's retaliation claim involving her June 4, 1997, negative performance evaluation.

3.   Defendant's Motion for Summary Judgment (Dkt. 47) is **granted** as to Plaintiff's retaliation claim involving her June 5, 1997, termination.

4.   Defendant's Motion for Summary Judgment (Dkt. 47) is **denied** as to Plaintiff's retaliation claims involving the May 1, 1997, Corrective Action memorandum and the May 9, 1997, Corrective Action memorandum.

5.   Defendant's Motion for Summary Judgment (Dkt. 47) is **denied** as to Plaintiff's hostile work environment claim.

6.   Plaintiff's request to strike the deposition testimony of Defillo, Yerkey, and Smith is **denied**.

DATED this 30th day of July, 2007.

_Earl H Carroll_
_____
Earl H. Carroll
United States District Judge